

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00251-CR

**SERGIO FLORES,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 278th District Court**
**Leon County, Texas**
**Trial Court No. CM-10-470**

## MEMORANDUM  OPINION

In two issues, appellant, Sergio Flores, challenges his conviction for engaging in organized criminal activity, a second-degree felony. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (West Supp. 2012). Specifically, Flores argues that the evidence supporting his conviction is insufficient. We affirm.

### I.     BACKGROUND

In this case, Flores is alleged to have conspired with Ashley Nicole Nelson, Rosario Hernandez Carrizales, and Jose Guadalupe Carrizales ("Lupe") to engage in

cattle rustling or, in other words, felony theft of cattle worth "$20,000 or more but less than $100,000."[1] According to the indictment, the alleged thefts transpired between March 10, 2009 and June 22, 2010 in Leon County, Texas.

Walter Rainbolt owns a 2,600-acre ranch in Marquez, Texas. From 1994 until the date of his arrest, Flores served as Rainbolt's ranch foreman. As ranch foreman, Flores managed the ranch and handled tasks assigned by Rainbolt, who only visited the ranch once or twice a week. Flores was the only ranch foreman employed by Rainbolt. Flores's gross monthly salary was $2,000. In addition, Rainbolt furnished Flores with a house located on the ranch and paid Flores's utilities.

Rainbolt testified that he had "anywhere from upwards of seven hundred and downward to four-fifty [four hundred and fifty]" head of cattle on the ranch at any given time. Rainbolt noted that he purchased one bull for every twenty to twenty-one cows. In addition, Rainbolt's cattle inventory also consisted of calves—some of which had notches in their left ears if they had been vaccinated and others that did not have

---

[1] Rosario, Nelson, and Lupe were also indicted in this case; however, all three agreed to testify against Flores in exchange for a recommendation of probation from prosecutors. Furthermore, the State alleged four overt acts in this case, which are as follows:

1. The Defendant, Sergio Flores, on or about August 12, 2009, endorsed or deposited a check from East Texas Livestock dated August 11, 2009 in the sum of $1,973.83 into his account at Wells Fargo, located in Marquez, Texas[,] representing the sum collected for cattle stolen from Walter Rainbolt.

2. Rosario Hernandez Carrizales delivered cattle stolen from Walter Rainbolt on June 22, 2010 to the East Texas Livestock sale in Crockett, Texas.

3. Ashley Nicole Nelson went to the East Texas Livestock sale to pick up a check on June 22, 2010 to collect sums for the sale of cattle stolen from Walter Rainbolt.

4. Jose Guadalupe Carrizales, aka Lupe Carrizales, provided transportation for the taking of stolen cattle from Walter Rainbolt to the East Texas Livestock Sale on June 22, 2010.

any ownership markers. Calves that Rainbolt intended to keep longer than a year and all adult cows received an "AH" brand and an additional brand on the high hip showing the year of birth.

Rainbolt acknowledged that he buys and sells cattle and that he typically sold his cattle at the Groesbeck Livestock Auction in Groesbeck, Texas. He typically sold cattle twice a year after the fall and spring roundups. Rainbolt counted the number of calves born each year, and he testified knowing the number of calves born at the time of the fall 2009 roundup and spring 2010 roundup, in particular.

In late 2009 and during 2010, Rainbolt noticed that his calf crop dropped below 50%. Ordinarily, Rainbolt's calf crop was approximately 70%. At trial, Rainbolt testified that he had some trouble with his bulls, and as a result, he "was constantly buying bulls." He also mentioned that Flores saw coyotes on the ranch and alleged that buzzards might be "getting" some of the calves. Rainbolt hired a "coyote eradication man" to kill any coyotes on or near the ranch, which proved to be unsuccessful.

On June 22, 2010, Rainbolt received a telephone call from Don Henderson, the part owner of the Groesbeck Livestock Auction. Henderson told Rainbolt that he had seen six of Rainbolt's cattle—four calves and two cows—at the East Texas Livestock auction barn in Crockett, Texas. Rainbolt subsequently drove to the sale barn in Crockett to investigate. After viewing the suspicious cattle, Rainbolt recognized that two cows had his brand and that all six were his.[2] Rainbolt did not recall selling cattle

---

[2] Rainbolt testified that he did not brand most calves and that calves received notches in their left ears only after they had been vaccinated.

at the East Texas Livestock auction barn, and he testified that the four calves that were up for sale were too light for him to sell. After verifying that the cattle were his, Rainbolt called Flores to make arrangements to come get the cattle.

Thereafter, Rainbolt examined the check-in slip for the cattle brought to the East Texas Livestock auction barn. The check-in slip included the name Rosario Carrizales. Rainbolt knew Rosario and her daughter-in-law, Ashley Nelson, because they would occasionally clean his house at the ranch. In fact, Flores had recommended that Rainbolt hire Rosario and Nelson to clean the ranch house. Rainbolt also knew Lupe Carrizales as Rosario's son and Nelson's common-law husband.

Brent Mast, a Special Ranger for the Texas and Southwestern Cattle Raisers Association, testified that he got involved in this case when Robert Ware, the brand inspector at the East Texas Livestock auction barn, called him to come over. Upon arriving, Special Ranger Mast spoke with Ware and Rainbolt about the suspicious cattle. They decided to wait to see who would come and claim the check for the sale of the cattle. Special Ranger Mast explained that there is no requirement to show identification when selling cattle because "it's so common for cowboys to haul cattle for other people, absentee owners or their employees are hauling cattle to the sale for them." Later in the afternoon, Rosario and Nelson came to pick up the check for the cattle.

Special Ranger Mast interviewed Rosario and Nelson when they arrived. Nelson served as an interpreter for Rosario, as she did not speak English. Rosario told Special Ranger Mast that she, Nelson, and Lupe had bought two cows and four calves from an

individual named Humberto Martinez four days earlier. She also told Special Ranger Mast that they kept the cattle in a trailer in front of their house in Marquez, Texas.

Special Ranger Mast then interviewed Nelson, who repeated most of the information stated by Rosario. Nelson was then asked to call Lupe. Special Ranger Mast asked Nelson to talk to Lupe in English, so he could understand the conversation; however, Nelson chose to speak Spanish with Lupe. Special Ranger Mast did hear Nelson mention the name "Martinez" to Lupe during this conversation. Later, Special Ranger Mast spoke to Lupe on the telephone and requested that he come to the Sheriff's office to discuss matters.

In his interview, Lupe stated that they had bought the cattle from Humberto Martinez, though his statement about the date of purchase differed from Rosario's and Nelson's. With regard to Martinez, Rosario, Nelson, and Lupe were unable to provide Special Ranger Mast with a phone number, location, home, or any information other than "he rented a trailer" from Rosario three years ago. Special Ranger Mast confronted Nelson with the inconsistency regarding the purchase date of the cattle in question. Nelson admitted that she had lied about the purchase date of the cattle "because she did not want to get anybody in trouble." Thereafter, Special Ranger Mast received information stating that the Carrizales family had sold cattle numerous times at several local barns, including Milano, Buffalo, Brazos Valley, and East Texas.

Special Ranger Mast and Deputy Victor Smith of the Leon County Sheriff's Department went to the Rainbolt ranch and interviewed Flores. Flores explained that he had last contacted Lupe the day before about trading a Jeep for a pickup truck.

Special Ranger Mast then asked Flores to call Lupe, and when he did, Flores spoke in Spanish to Lupe, even though Lupe understood and spoke English. Flores denied knowing Humberto Martinez.

After speaking with Flores, Special Ranger Mast and Deputy Smith drove to the Carrizales house "looking for signs that a cattle trailer had been left there for four days with cattle in them." Neither found tracks, cow manure, or other evidence to corroborate Rosario's statement that the cattle had been purchased four days earlier and were left at the Carrizales' house.

Later, Special Ranger Mast received a telephone call from Flores, stating that he had some information about Lupe. Flores noted that Lupe had hunted hogs before on the Rainbolt ranch. Flores denied owning any cattle of his own. However, Flores later changed his story regarding cattle ownership. According to Special Ranger Mast, Flores admitted that he had purchased calves before from a Hispanic male named "Joel," though Flores did not know where "Joel" lived.[3] Special Ranger Mast then explained:

> Joel would come to the Rainbolt ranch in an SUV type vehicle pulling a bumper pull trailer with calves in it and Mr. Flores would purchase these calves at a reduced price, below their normal value. And then he in turn would resale [sic] those calves at the sale barn. He did provide me with a cell phone number of Joel, which when I tried it actually got—he told me it was Hispanic, didn't speak English, I got, I believe, [O]fficer Mata from Buffalo PD to make the phone call. And it was an English speaking person that didn't know Joel and had said he had had the phone number for quite awhile [sic].

---

[3] According to Rainbolt, Flores never stated that he was buying and selling cattle; furthermore, Rainbolt noted that Flores did not have permission to keep any cattle on the Rainbolt ranch, nor did Flores have permission to sell any of Rainbolt's cattle and keep the proceeds.

Mr. Flores, when I asked him when the last time he talked to Joel was he said it has been several months since he talked to him on the phone.

Special Ranger Mast then told Flores that he planned to DNA test the calves in question. Flores responded that,

he may have accidentally sold some of Mr. Rainbolt's cattle because when he bought the cattle from Joel he would put them in a set of pens . . . or the calves that he bought from Joel could have commingled in the pens with some of Mr. Rainbolt's calves. And when he sold them he could have somehow mixed them up and sold them.

Based on the state of his investigation, Special Ranger Mast obtained bank and cell phone records for the Carrizales family and Flores.

Rainbolt testified that he was not suspicious of Flores initially; however, Rainbolt's opinion changed when he overheard Flores's conversation with Special Ranger Mast. According to Rainbolt, Flores was evasive because he would not answer all of Special Ranger Mast's questions and because he spoke to Lupe in Spanish despite being asked to speak in English. Rainbolt then recalled that he was suspicious of Flores's lifestyle. Rainbolt noted that Flores's wife and daughter had taken thirteen or fourteen-day trips to Europe the past two summers at their own expense, and Flores bought two jet skis, a boat, and a new Ford truck. Essentially, Rainbolt had noticed that Flores's spending habits had changed in recent years. However, Rainbolt acknowledged that Flores had borrowed two to three thousand dollars from him "three or four times" and that Flores's wife worked as a teacher in the Leon Independent School District. The record does not reflect the date of all of the loans.

At trial, Nelson implicated Flores. Nelson noted that she and Lupe are married and that they have a son named Alphonso and that Rosario is her mother-in-law. According to Nelson, she and Rosario began cleaning Rainbolt's ranch house in 2008 or 2009. Beginning in 2009, Flores coordinated with Lupe, Rosario, and Nelson the sale of cattle from Rainbolt's ranch. Nelson stated that Flores would call Lupe to say that he had cows ready to sell. Lupe would then call Nelson, and she would bring a trailer to the ranch to pick up the cattle. Nelson recalled that Flores helped load the cattle on the trailer. Nelson and Rosario drove the cattle to various sale barns and requested that the payment checks be made out to Lupe, Rosario, or Alphonso. Lupe and Rosario would then cash the check at the Wells Fargo bank in Marquez, where they had accounts. The group met with Flores and gave him all of the money from the sales. Flores gave the group about $300 to $500 for their part in each sale. Nelson testified that all of the cattle sold by the Carrizaleses, with the exception of one load, were stolen from the Rainbolt ranch.

With regard to Humberto Martinez, Nelson admitted that the name was fictitious. Nelson testified that, on June 22, 2010, she received a telephone call from Flores stating that "there was a problem with the cows." Flores requested that the group meet at the "Henry Padgett, the Country Corner" Exxon gas station. According to Nelson, Flores told them that the six cattle were stolen and "to just go get the check and act calm and make up a story if they asked any questions." Though Flores did not tell the group to use the name, Humberto Martinez, Nelson recounted that Flores told them "not to use his name, to make up a story with another name."

The record reflects that the Carrizaleses sold cattle suspected of originating from the Rainbolt ranch more than twenty times. And, the record contains invoices from each of the sales.

State's exhibit 44A-D shows that, for one sale, Flores cashed a check dated August 11, 2009 from East Texas Livestock through his Wells Fargo account. The check was made out to Lupe for $1,973.83; however, Nelson explained that Flores cashed the check because Rosario and Lupe were not available to do so, and Flores could not wait.[4] On another occasion, Flores sold Pascual Torres three cows for $2,000 on November 4, 2009. Each of these cows bore the Rainbolt "AH" brand. State's exhibit 50 shows that Flores deposited Torres's check into his Wells Fargo account on November 5, 2009.

The State also called Jacque Gilliam, a licensed certified public accountant in Texas, to testify regarding her analysis of the bank records and sales invoices in this case. Based on her analysis, Gilliam noted that, excluding the attempted sale on June 22, 2010, Flores and the Carrizaleses sold ninety-seven cows for $34,028.40.[5]

At the conclusion of the evidence, the jury found Flores guilty of engaging in organized criminal activity. *See id.* The jury sentenced Flores to three years' incarceration in the Institutional Division of the Texas Department of Criminal Justice

---

[4] Flores's bank records were also admitted into evidence. The East Texas Livestock check was cashed on August 12, 2009, and Flores's bank records reflect that he made a $500 deposit on that day. In fact, Flores's bank records indicate that he made a: (1) $500 deposit on August 6, 2009; (2) $500 deposit on August 12, 2009; (3) $400 deposit on August 14, 2009; and (4) $500 deposit on August 17, 2009. This particular bank record only covered savings-account transactions occurring between July 19, 2009 and August 19, 2009.

[5] A second summary produced by Gilliam was included in the record. This summary, dated June 21, 2011, indicates that the total value of cattle sold by the Carrizaleses amounted to $37,819.61, excluding the attempted June 22, 2010 sale.

with a $10,000 fine.  In addition, Flores was ordered to pay, in addition to court costs,

$54,561.82 in restitution to Rainbolt.  This appeal followed.

## II.    ACCOMPLICE-WITNESS TESTIMONY

In his first issue, Flores contends that the evidence supporting his conviction is

insufficient because accomplice testimony was not corroborated by other evidence

tending to connect Flores to the charged offense.  We disagree.

## A.    Applicable Law

The Texas Court of Criminal Appeals has stated the standard of review for

sufficiency of non-accomplice evidence as follows:

> [U]nder Texas Code of Criminal Procedure Article 38.14, a conviction
> cannot stand on an accomplice witness's testimony unless the testimony is
> corroborated by other, non-accomplice evidence that tends to connect the
> accused to the offense.  Evidence that the offense was committed is
> insufficient to corroborate an accomplice witness's testimony.  And an
> accomplice's testimony cannot be corroborated by prior statements made
> by the accomplice witness to a third person.
>
> . . . .
>
> When reviewing the sufficiency of non-accomplice evidence under
> Article 38.14, we decide whether the inculpatory evidence tends to
> connect the accused to the commission of the offense.  The sufficiency of
> non-accomplice evidence is judged according to the particular facts and
> circumstances of each case.  The direct or circumstantial non-accomplice
> evidence is sufficient corroboration if it shows that rational jurors could
> have found that it sufficiently tended to connect the accused to the
> offense.  So when there are conflicting views of the evidence—one that
> tends to connect the accused to the offense and one that does not—we will
> defer to the factfinder's resolution of the evidence.  Therefore, it is not
> appropriate for appellate courts to independently construe the non-
> accomplice evidence.

*Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted); *see Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (noting that appellate courts review non-accomplice evidence in the light most favorable to the verdict); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

The Texas Court of Criminal Appeals has also noted that: "There need only be some non-accomplice evidence tending to connect the defendant to the crime, not to every element of the crime." *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007); *see Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) ("No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt."). Furthermore, when reviewing the sufficiency of the non-accomplice evidence, "all of the non-accomplice testimony is viewed together, rather than as isolated, unrelated incidents . . . ." *Simmons v. State*, 282 S.W.3d 504, 511 (Tex. Crim. App. 2009). And, "circumstances that are apparently insignificant may constitute sufficient evidence of corroboration." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (citing *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999)).

Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *See id.*; *see also Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is also proper corroborating evidence. *McDuff v. State*, 939 S.W.2d

607, 613 (Tex. Crim. App. 1997). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

**B.      Discussion**

Here, State's exhibit 44-D shows that Flores, the foreman at the Rainbolt ranch, cashed a $1,973.83 check dated August 11, 2009, from East Texas Livestock and deposited some of the proceeds from the check in his Wells Fargo savings account. Witnesses testified that this sale involved Rainbolt cattle; however, Special Ranger Mast admitted that, for some of the alleged cattle sales, many of the cattle were neither branded nor had notches in their left ears. In any event, Special Ranger Mast explained that many of the sales involved calves, and Rainbolt stated the calves were too young to be sold and likely were not branded because they had not been vaccinated. Nevertheless, Rainbolt testified that the sales in question involved his cattle.

In addition, Torres testified that Flores sold him three cows that bore the Rainbolt "AH" brand for $2,000. State's exhibit 50 shows that Flores deposited Torres's check into his Wells Fargo account on November 5, 2009. Furthermore, Rainbolt testified that Flores appeared nervous and evasive when interviewed by Special Ranger Mast about the attempted sale of Rainbolt cattle on June 22, 2010. The record also reflects that, during the relevant time period, Flores made expensive purchases, such as paying for two trips to Europe for his wife and daughter, buying two jet skis, and a new Ford pickup truck.

Further, in an interview with Special Ranger Mast, Flores stated that he had sold cattle in the past to "Joel," an individual who apparently does not exist. Rainbolt testified that, although Flores lived on ranch property, he did not have permission to keep cattle on the ranch, nor did he have permission to sell Rainbolt's cattle and keep the proceeds from the sale. With regard to the selling of cattle to "Joel," Flores admitted that he may have "accidentally" sold some Rainbolt cattle. The record also indicates that, during the time the conspiracy allegedly transpired, Rainbolt's calf crop was exceptionally low—below 50%.

When viewing the non-accomplice evidence in the light most favorable to the verdict, we conclude that there is sufficient evidence that "tends to connect the defendant to the offense." *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *see also Smith*, 332 S.W.3d at 439, 442; *Joubert*, 235 S.W.3d at 731; *Gill*, 873 S.W.2d at 48. Accordingly, we hold that the record contains sufficient evidence to corroborate the accomplice-witness evidence contained in the record and, therefore, satisfies article 38.14 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *see also Joubert*, 235 S.W.3d at 731; *Gill*, 873 S.W.2d at 48; *Cathey*, 992 S.W.2d at 462. We therefore overrule Flores's first issue.

### III.    SUFFICIENCY OF THE EVIDENCE

In his second issue, Flores argues that the evidence supporting his conviction is legally insufficient to establish that he engaged in organized criminal activity.

### A.    Applicable Law

The Texas Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). Accomplice-witness testimony can be sufficient to support a conviction under the evidentiary sufficiency standard articulated in *Jackson v. Virginia*. *Taylor v. State*, 10 S.W.3d 673, 684 (Tex. Crim. App. 2000); *McDuff*, 939 S.W.2d at 614.

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2792-93. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*

*v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Finally, as stated above, the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically-correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Here, Flores was charged with engaging in organized criminal activity. A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination, the person commits theft. TEX. PENAL CODE ANN. § 71.02(a)(1).

A finding of guilt for engaging in organized criminal activity requires (1) an intent to participate in a criminal combination and (2) performance of some act, although not necessarily criminal in itself, in furtherance of the agreement. *Nwosoucha v. State*, 325 S.W.3d 816, 831 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). Because direct evidence is rarely available to prove the existence of an agreement, circumstantial evidence is sufficient and is almost always needed. *Id.* The jury may therefore infer an agreement among a group working on a common project when each person's action is consistent with realizing the common goal. *Id.* The Texas Court of Criminal Appeals has noted that, in the context of section 71.02, "the State must prove that the appellant intended to establish, maintain, or participate in a group of three or more, in which the members intend to work together in a continuing course of criminal activities." *Nguyen*

*v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999). "'Profits' means property constituting or derived from any proceeds obtained, directly or indirectly, from an offense listed in section 71.02." TEX. PENAL CODE ANN. § 71.01(c) (West 2011).

Here, the State alleged that the conspirators participated in a combination to commit the theft of Rainbolt's cattle. Theft is the unlawful appropriation of property done with intent to deprive the owner of the property. *Id.* § 31.03(a) (Vernon Supp. 2012). And finally, "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to the result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2011).

**B.    Discussion**

In the instant case, Nelson testified that Flores coordinated with Lupe, Rosario, and her to steal cattle from the Rainbolt ranch and sell them at various sale barns. Nelson recounted that Flores would call Lupe to say that he had cows ready to sell. Lupe would inform Nelson, and Nelson would bring a trailer to the Rainbolt ranch to pick up the cattle. Nelson testified that Flores helped load the cattle on the trailer. Nelson and Rosario would then sell the cattle at various sale barns and request that the sale checks be made out to Lupe, Rosario, or Alphonso, Lupe and Nelson's child. Lupe and Rosario would cash the check at Wells Fargo, and then the group would meet with Flores. Flores took the money from the sale and gave the group $300 to $500 for each sale. Nelson stated that all of the cattle they sold, with the exception of one load, were stolen from the Rainbolt ranch. Some, though not all, of the cattle involved in these sales bore the Rainbolt "AH" brand or had notches in their left ear.

In addition, Torres testified that, in November 2009, Flores sold him three cows that bore the Rainbolt "AH" brand for $2,000. The record reflects that Flores endorsed the check received from Torres and deposited the proceeds into his Wells Fargo account. Furthermore, Flores endorsed and cashed the $1,973.83 check dated August 11, 2009 from East Texas Livestock. Flores's bank records show that he deposited $500 of the proceeds from this check into his savings account. As mentioned previously, the evidence established that the cattle sold at the East Texas Livestock auction barn in August 2009 were stolen from the Rainbolt ranch. And finally, Gilliam testified that the Carrizaleses, at the direction of Flores, sold ninety-seven of Rainbolt's cows for $34,028.40 from March 1, 2009 to June 2010.

Reviewing the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could conclude that Flores: (1) intended to participate in a criminal combination with Lupe, Rosario, and Nelson to steal and sell Rainbolt cattle and keep the sales proceeds; and (2) engaged in acts in furtherance of the agreement. *See id*. § 71.02(a); *see also Nwosoucha*, 325 S.W.3d at 831. We therefore conclude that the record contains sufficient evidence to support Flores's conviction for engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. § 71.02(a); *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Lucio*, 351 S.W.3d at 894; *Nwosoucha*, 325 S.W.3d at 831. Flores's second issue is overruled.

## IV. CONCLUSION

Having overruled both of Flores's issues on appeal, we affirm the judgment of the trial court.

AL SCOGGINS
Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed May 9, 2013
Do not publish
[CR25]